**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────

CHRISTINE LEE S.,

                              Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY,

                             Defendant.

No. 5:20-CV-1008
(CFH)

───────────────────────────

**APPEARANCES:**

Law Offices of Kenneth Hiller, PLLC
6000 North Bailey Avenue, Ste. 1A
Amherst, New York 14226
Attorneys for plaintiff

Social Security Administration
J.F.K. Federal Building,
15 New Sudbury Street, Rm. 625
Boston, Massachusetts 02203
Attorneys for defendant

**OF COUNSEL:**

JUSTIN M. GOLDSTEIN, ESQ.
KENNETH R. HILLER, ESQ.

HUGH DUN RAPPAPORT, ESQ.

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER[1]

      Christine Lee S.[2] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("the

Commissioner") denying her application for disability insurance benefits.  See Dkt. No. 1

───────────────

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 5.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

("Compl."). Plaintiff moves for reversal and remand for the determination of benefits. See Dkt. No. 14. The Commissioner opposes the motion. See Dkt. No. 17. For the following reasons, the Commissioner's cross-motion for judgment on the pleadings is denied and the determination of the Commissioner is reversed and remanded for further proceedings.

## I. Background

On March 17, 2017, the alleged disability onset date, plaintiff filed a Title XVI application for supplemental security income. See T. at 158-66.[3] The Social Security Administration ("SSA") denied plaintiff's claim on July 11, 2017. See id. at 79-83. Plaintiff requested a hearing, see id. at 91, and a hearing was held on February 25, 2019, before Administrative Law Judge ("ALJ") Monica D. Jackson. See id. at 31-60. On September 24, 2019, the ALJ issued an unfavorable decision. See id. at 10-22. On July 1, 2020, the Appeals Council denied plaintiff's request for review. See id. at 1-6. Plaintiff commenced this action on August 31, 2020. See Compl.

## II. Legal Standards

### A. Standard of Review

---

[3] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. See Dkt. No. 12. Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence.  See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).  The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotations marks, citation, and emphasis omitted).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence.  See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986).  However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

**B. Determination of Disability**

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  See id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has

an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since March 17, 2017, her application date.  See T. at 12.  At step two, the ALJ found that plaintiff had the following severe impairments: "fibromyalgia, myoclonus, arthritis, residuals from a toe fracture, headaches, psoriasis, diabetes, obesity, carpal tunnel syndrome, obstructive sleep

apnea ("OSA"), insomnia, asthma, chronic reflux, and esophagitis[.]"  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See id. at 15.  Before reaching step four, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b) except

> she could occasionally operate foot controls.  She could occasionally balance, stop, kneel, crouch, crawl, and climbs ramps and stairs.  She could never climb ropes, ladders, or scaffolds.  She could frequently reach, handle, finger, and feel with both upper extremities.  She could never be exposed to high, exposed places or moving mechanical parts. The claimant could have occasional exposure to extreme heat, extreme cold, wetness, humidity, vibration, and atmospheric conditions.  She can tolerate a moderate noise intensity level as defined in the Dictionary of Occupational Titles/Selection Characteristics of Occupations.  She can tolerate occasional exposure to light brighter than that typically found in an indoor work environment such as an office or retail store.

Id. at 16.  At step four, the ALJ determined that plaintiff had no relevant past work.  See id. at 20.  At step five, considering the plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  See id. at 20-21.  Thus, the ALJ determined that plaintiff had not been under a disability, as defined in the Social Security Act, since the alleged disability onset date.  See id. at 22.

**IV. Arguments**[4]

---

[4] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF at the headers of the page.

Plaintiff argues that the ALJ (1) based the RFC and consistency findings on mischaracterizations of the record; (2) improperly relied on the stale opinion of Disability Determination Services consultant R. Dickerson, M.D.; (3) inappropriately discounted the opinion of plaintiff's primary care provider, Nancy Gaskill, P.A.; (4) failed to find plaintiff's radiculopathy severe at step two; and (5) failed to obtain additional evidence related to her radiculopathy, resulting in a gap in the record.  See Dkt. No. 14.  The Commissioner argues that the ALJ's findings are supported by substantial evidence and the ALJ afforded appropriate weight to the relevant medical opinions.  See Dkt. No. 16.

## V. Analysis

### A.  Consistency of Plaintiff's Allegations

Plaintiff argues that the ALJ "made negative inferences based upon a mischaracterization of the record . . . [and] did not resolve conflicts in the record but made conclusive findings indicating that evidence does not exist to support [p]laintiff's allegations and limitations."  Dkt. No. 14 at 16.  The Commissioner argues that "the ALJ properly relied on the objective medical evidence[] . . . [and] [p]laintiff's admissions about her activities of daily living."  Dkt. No. 17 at 5-6.

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations.  At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2011) (citing 20 C.F.R. § 404.1529(b)); see Social Security Ruling ("SSR") 16-3p: Titles

II and XVI Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *1-2 (Oct,

25, 2017).  "If the claimant does suffer from such an impairment, at the second step, the

ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be

accepted as consistent with the objective medical evidence and other evidence' of

record."  Id. (alterations in original) (quoting 20 C.F.R. § 404.1529(a)).  "While

statements of pain are insufficient, an ALJ may not reject statements of intensity and

persistence of pain or other symptoms affecting an individual's ability to work because

of a lack of substantiating medical evidence."  Michael H. v. Saul, No. 5:20-CV-417

(MAD), 2021 WL 2358257, at *10 (N.D.N.Y. June 9, 2021) (citing 20 C.F.R.

§ 404.1529(c)(2)).  The ALJ "is not required to accept the claimant's subjective

complaints without question; he may exercise discretion in weighing the credibility of the

claimant's testimony in light of the other evidence in the record."  Genier, 606 F.3d at 49

(citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).

"Under SSR 16-3p, when evaluating a claimant's symptom intensity, '[t]he ALJ

must consider the entire case record, including objective medical evidence, a claimant's

statements about the intensity, persistence, and limiting effects of symptoms,

statements and information provided by medical sources, and any other relevant

evidence in the claimant's record.'"  Kearney v. Berryhill, No. 1:16-CV-00652 (MAT),

2018 WL 5776422, at *6 (W.D.N.Y. Nov. 2, 2018) (alteration in original) (quoting Vered

v. Colvin, No. 14-CV-4590 (KAM), 2017 WL 639245, at *15 (E.D.N.Y. Feb. 16, 2017)).

The ALJ must "clearly demonstrate[] [that] he considered the entire case record . . . as

required by SSR 16-3p."  Id. ("The ALJ provided significant detail regarding the basis of

this finding, noting there is little objective evidence of record to support the alleged

severity of the symptoms [the] [p]laintiff described at the hearing."); <u>see</u>, <u>e.g.</u>, <u>Michael H.</u>, 2021 WL 2358257, at *11 (affirming the ALJ's determination where the ALJ "examine[d] inconsistencies in the record" between the plaintiff's testimony and the medical records and opinions); <u>Blyden v. Comm'r of Soc. Sec.</u>, No. 19-CV-01643 (FPG), 2020 WL 6785495, at *3 (W.D.N.Y. Nov. 18, 2020) ("[T]aken together, [the] [p]laintiff's treatment records do not support [the] [p]laintiff's inability to perform sedentary work, as the ALJ found.").

Here, the ALJ found that plaintiff's medically-determinable impairments could be expected to cause the alleged symptoms, but that her statements as to intensity, persistence, and limiting effect of the symptoms were not entirely consistent with the record.  <u>See</u> T. at 17.  The ALJ summarized plaintiff's symptoms, noting that: she is always tired and in pain; if she is having a bad day, she cannot care for personal needs and pain affects any type of physical activity; she cannot sit or stand for a workday or drive for very long; she uses an electric shopping cart and generally needs a cane to ambulate; and she experiences involuntary jerking movements and headaches.  <u>See</u> <u>id.</u> at 16, 37-42,188-89, 191, 217.  Plaintiff further testified that she can lift a gallon of milk, perform very few chores, sit and stand for thirty minutes at a time, has to elevate her legs all of the time, and spends most of her days laying down.  <u>See</u> <u>id.</u> at 17, 40-41, 47-50.

### 1. Exertional Limitations

Plaintiff argues that the ALJ erred in finding that, aside from Kautilya Puri, M.D.'s treatment note stating that plaintiff used a cane, "the remaining treatment record does not document use of a cane to ambulate."  T. at 19; <u>see</u> Dkt. No. 14 at 17-18.  The

Commissioner contends that Dr. Dickerson found that a cane was unnecessary, and that plaintiff's record citations refer only to her subjective allegations, not medical opinions addressing its medical necessity.  <u>See</u> Dkt. No. 17 at 6-8.

To be medically necessary "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which the assistive device is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain, and any other relevant information)."  SSR 96-9p, Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996).  "A cane need not be prescribed to be considered medically necessary, but there must be specific medical documentation establishing the need for it and the circumstances surrounding that need."  <u>Shepard v. Comm'r of Soc. Sec.</u>, No. 5:16-CV-1347 (ATB), 2017 WL 5508377, at *11 (N.D.N.Y. Nov. 15, 2017).  The plaintiff has the burden to establish medical necessity.  <u>See Wilson v. Comm'r of Soc. Sec.</u>, No. 6:13-CV-643 (GLS/ESH), 2014 WL 4826757, at *11 (N.D.N.Y. Sept. 29, 2014).  A physician's observation that a patient used a cane or had an unsteady gait does not satisfy this burden.  <u>See Hoke v. Colvin</u>, No. 1:14-CV-0663 (GTS/CFH), 2015 WL 3901807, at *14 (N.D.N.Y. June 25, 2015).  "[W]hen there is medical documentation about a cane in the record, an ALJ's failure to determine whether the cane is medically necessary or to incorporate the use of a cane into the RFC is legal error."  <u>Charles F. v. Comm'r of Soc. Sec.</u>, No. 19-CV-1664 (LJV), 2021 WL 963585, at *4 (W.D.N.Y. Mar. 15, 2021).

This Court has held that substantial evidence supported an ALJ's determination that a plaintiff "ha[d] mild limitations, that the cane [wa]s not medically necessary, and that he ha[d] the capacity to perform light work" where the only evidence to support the plaintiff's medical-necessity argument was a physician's observation that he had an "unsteady gait" and a note "during a callous examination that [the plaintiff] ambulated with a cane and had moderate limitations in walking and standing." Hoke, 2015 WL 3901807, at *13; *12.  In Hoke, a consultative examiner "concluded that it was unclear whether the cane was medically necessary because [the plaintiff] used the cane inconsistently," and the plaintiff's treating physician did not opine whether a cane was medically necessary.  Id. at *13.  Rather, the examiners consistently noted that the plaintiff had "full range of motion" and only "mild limitations on sitting and standing for long periods, walking long distances, bending, squatting, climbing stairs, and kneeling[.]"  Id. at *12-13.

This Court has also explained that an "ALJ's RFC determination that [the] plaintiff could perform light work, and his step 4 and step 5 determinations, did not need to account for [the] plaintiff's use of a cane[]" because "[t]he record contain[ed] no documentation . . . regarding the cane prescription . . .[,] [and] [w]hile [the] plaintiff notes that numerous medical records mention her use of a cane, none explain if the cane was medically necessary."  Allen v. Comm'r of Soc. Sec., No. 5:14-CV-1576 (DNH/ATB), 2016 WL 996381, at *8 (N.D.N.Y. Feb. 22, 2016), report and recommendation adopted sub nom. 2016 WL 1020858 (N.D.N.Y. Mar. 14, 2016).  The Court also held that the ALJ's determination was sufficiently supported where the ALJ "noted that eyeglasses were the only assistive device listed[] . . . [and] that [the] plaintiff exhibited a normal gait

and good balance when walking." Id.; compare Caridad H. v. Comm'r of Soc. Sec., No. 5:18-CV-893 (TWD), 2019 WL 3253228, at *7 (N.D.N.Y. July 19, 2019) (finding that the plaintiff "failed to carry her burden to establish the medical necessity for the use of her cane[]" because she was "unable to point to any medical records suggesting that a cane is medically necessary."), with Shepard, 2017 WL 5508377, at *12 (remanding for "clarification of the necessity of [the] plaintiff's cane" because "there are multiple medical records that mention [the] plaintiff's cane, and some that 'encourage' [the] plaintiff to continue to use the assistive device.").

        Contrary to the ALJ's statement that "the remaining treatment record does not document use of a cane to ambulate[,]" T. at 19, there are numerous records that mention plaintiff's use of cane.  See id. at 538, 618, 629, 649, 654, 661, 674, 697, 712, 723, 745, 757, 765, 770, 775, 790, 804, 836.  The Commissioner contends that "[a]lthough the ALJ admittedly could have expressed herself more clearly, what she appears to have meant is that the record squarely refutes [p]laintiff's allegation that she 'always' used a cane." Dkt. No. 17 at 7.  The regulations do not define "medical documentation," and a cane does not need to be prescribed to be considered "medically necessary."  SSR 96-9p, 1996 WL 374185, at *7; Shepard, 2017 WL 5508377, at *11. It is unclear whether plaintiff had a prescription for her cane, but there is not one in the record.  Compare T. at 280 ("It was prescribed by a doctor[.]"), with id. at 69 ("[C]laimant reports cane & walker suggested by doctor but not prescribed."), and id. at 194 ("Brace, reading [glasses], cane and walker were suggested by the doctor but not prescribed[.]"). Although plaintiff used a cane during the majority of her examinations with PA Gaskill and Ojugbell Ifechukwude, M.D., neither addressed its medical necessity.  See id. at

654, 661, 667, 674, 765-67; see, e.g., Allen, 2016 WL 996381, at *8.  The ALJ noted Dr.

Puri's conclusion that a cane was not "medically necessary."  T. at 17.  Dr. Puri opined

that plaintiff "uses a cane for pain and weight bearing always.  It was prescribed by a

doctor, and her gait with or without it is about the same.  I do not feel it is required."  Id.

at 280.  Dr. Puri observed that plaintiff was limping and could not walk on her heels or

toes.  See id.  Additionally, plaintiff demonstrated a normal gait throughout her treatment

history.  See id. at 382, 387, 663; see also Shepard, 2017 WL 5508377, at *11 (noting

that it was "not completely clear" whether a physician's statement that "[t]he claimant's

use of the cane does not *appear necessary*[]" meant that "use of the cane was not

medically necessary[]" where the physician also noted that the plaintiff had a normal gait

but could not walk on his heels and toes.); Allen, 2016 WL 996381, at *8.  In June 2017,

during a psychiatric evaluation, Dr. Jeanne Shapiro, M.D., noted that plaintiff "used no

assistive devices but does use an ankle brace, a walker and cane prn."[5]  T. at 288.  In

October 2018, following plaintiff's gastric bypass surgery, she ambulated "normally" with

"no cane[,]" id. at 460, but the following month her ambulation was "limited."  Id. at 465.

The ALJ did not discuss these medical records to evaluate whether a cane was

medically necessary.  See T. at 280; 17, 19; see also Charles F., 2021 WL 963585, at

*4; see Rowe v. Berryhill, No. 1:17-CV-00208 (MAT), 2018 WL 4233702, at *4

(W.D.N.Y. Sept. 6, 2018) (finding that "the ALJ's discussion of [the] [p]laintiff's use of the

cane inadequate[,]" where a "discharge summary noted the cane should be used to

assist with ambulation for four weeks[,]" and "the record contains several instances

where Plaintiff's range of motion was limited[.]").  Although the ALJ's statement that "the

---

[5] "'PRN' is medical abbreviation meaning 'when necessary.'"  Medovich v. Colvin, No. 3:13-CV-1244 (GLS/ESH), 2015 WL 1310310, at *7, n.10 (N.D.N.Y. Mar. 23, 2015).

remainder of the record does not document" plaintiff's use of a cane is incorrect, this error is harmless as there is substantial evidence supporting the ALJ's decision.  T. at 17.  No physician determined that a cane was "medically necessary" or "encouraged" its use; there is no evidence of a prescription in the record; and even in the records that reflect plaintiff used a cane, her gait, motor strength, and range of movement were normal.  Shepard, 2017 WL 5508377, at *12; Rowe, 2018 WL 4233702, at *4; see Rosado, 805 F. Supp. 147 at 153 ("[E]ven where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's][,]" the Commissioner's decision must be upheld if supported by substantial evidence.).  Based on a physical examination, Dr. Puri concluded that plaintiff's "gait with and without [her cane] [wa]s about the same"; therefore, he did "not feel it [wa]s required."  T. at 280.  As such, remand is not warranted on this ground.

## 2. Radiculopathy

Plaintiff argues that the ALJ erred by failing to consider evidence from John Michael King, M.D., showing that her radiculopathy was severe.  See Dkt. No. 14 at 18.  Plaintiff argues that "[t]he EMG results omitted from the ALJ's summation of evidence show greater findings and support another diagnosis that was not found severe at Step 2."  Id.  Specifically, plaintiff contends that "records from Dr. King show additional evidence missing from the current record, including an MRI and updated treatment notes of" neurologist Islam Hassan, D.O., and "it is unclear why the additional records were not requested by the ALJ."  Id.  The Commissioner argues that "[p]laintiff was diagnosed with cervical radiculopathy based, in part, on the EMG results," but "has not

made any meaningful attempt to sustain her burden of establishing that her cervical radiculopathy caused any specific, functional, work-related limitations beyond what the ALJ included in her RFC finding." Dkt. No. 17 at 9. Moreover, the Commissioner contends that the ALJ held the record open for plaintiff to "submit Dr. King's records, including any records relating to the MRI[.]" Id.

At step two, the ALJ must determine whether the claimant has a severe impairment that significantly limits his physical or mental abilities to do basic work activities. See 20 C.F.R. § 404.1520(c). "Although the Second Circuit has held that this step is limited to 'screening out *de minimis* claims,' [ ] the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition severe." Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (quoting Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995); Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). Moreover, failing to find a specific impairment severe at step two can be "harmless where the ALJ concludes (a) there is at least one other severe impairment, (b) the ALJ continues with the sequential evaluation, and (c) the ALJ provides explanation showing he adequately considered the evidence related to the impairment that is ultimately found non-severe." Robert D. v. Comm'r of Soc. Sec., No. 6:19-CV-0340 (DJS), 2020 WL 2553260, at *4 (N.D.N.Y. May 20, 2020).

Although a plaintiff has the general burden of proving that he or she has a disability within the meaning of the Act, "[g]iven the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical

record if it is incomplete." Tammy H. v. Comm'r of Soc. Sec., No. 5:18-CV-851 (ATB), 2019 WL 4142639, at *7 (N.D.N.Y. Aug. 30, 2019).  "While one tool in an ALJ's toolbox might be to seek the assistance of [the] [p]laintiff's counsel, an ALJ cannot merely rely on requests of counsel to obtain records to fulfill the duty to investigate and develop the record." Carr v. Comm'r of Soc. Sec., No. 16-CV-5877 (VSB/JCF), 2018 WL 3410012, at *3 (S.D.N.Y. July 12, 2018).  Rather, "courts in this Circuit have held that an ALJ's mere request to plaintiff or his counsel to provide additional medical records does not sufficiently satisfy the ALJ's duty to develop the record when the records are never provided[.]"  Id. at *4 (collecting cases).  "In this regard, the ALJ must make every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." Kentile v. Colvin, No. 8:13-CV-880 (MAD/CFH), 2014 WL 3534905, at *12 (N.D.N.Y. July 17, 2014) (citations and internal quotation marks omitted) (alterations in original).

The Southern District of New York remanded a case where "[t]he ALJ recognized that [specific] treatment records . . . , if they existed, were important" and "left the record open after the hearings and followed up with [the] [p]laintiff's representative to obtain additional records," but the treatment records were not a part of the administrative transcript. Ana Rosado v. Berryhill, No. 18-CV-2177 (KMK/JCM), 2019 WL 1993996, at *9 (S.D.N.Y. Apr. 5, 2019), report and recommendation adopted, 2019 WL 1988530 (S.D.N.Y. May 6, 2019).  The Court explained that there was "no evidence in the record that the ALJ ever subpoenaed records" and "[t]he absence of treatment records represents a significant gap in the administrative record as [the physician] . . . reported disabling symptoms and limited functional capacity that, if given weight, may affect the

ALJ's RFC assessment." Id. at *11; see also Outley v. Astrue, No. 5:09-CV-0141

(FJS/VEB), 2010 WL 3703065, at *4 (N.D.N.Y. Aug. 26, 2010), report and

recommendation adopted sub nom. 2010 WL 3703061 (N.D.N.Y. Sept. 13, 2010)

(remanding "because the ALJ failed to properly develop the record" where the ALJ told

the plaintiff and counsel, "'You've got 10 days, get me back a medical source statement

from [your treating physician]' . . . [but] the ALJ made no attempt to obtain the

necessary information himself.").

Plaintiff appeared before the ALJ on February 25, 2019. See T. at 31. At the

hearing, plaintiff explained that Dr. Hassan referred her to Dr. King, and Dr. King had

newly diagnosed her with carpal tunnel syndrome. See id. at 45, 47. Three days before

the hearing, plaintiff had an "MRI of the neck" "which [she] [did not] have the results for

yet." Id. at 47; 41. Therefore, the ALJ did not have the results or any related treatment

notes at the time of the hearing. See id. at 47. The ALJ kept the record open so that

plaintiff could submit records "about the carpal tunnel and about the neck and the back

and that kind of -- if she has had an MRI done, I would think it would[] . . . be material to

the outcome of the case." Id. At the end of the hearing, the ALJ asked plaintiff's

representative[6] whether the record was complete. See id. at 59. Plaintiff's

representative stated, "I'm unsure of the Dr. King matter. . . . If we could have a couple

of weeks to review this . . . and get that to you if necessary, I would greatly appreciate

---

[6] The Commissioner indicates that plaintiff was represented by a non-attorney representative at her hearing and the ALJ's decision states the same. See Dkt. No. 17 at 2; T. at 10. However, during plaintiff's hearing, the ALJ referred to plaintiff's representative as an attorney, and the Appeals Council noted that it considered the "Brief by Attorney Russel Shanahan[.]" T. at 4, 33. Whether plaintiff was represented by counsel or a non-attorney representative does not change the Court's analysis. See Ana Rosado, 2019 WL 1993996, at *9 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("The ALJ's duty to develop the record exists even where the claimant is represented by counsel or a non-lawyer representative such as a paralegal.")).

it." Id.  The ALJ agreed to "leave the record open [for] 14 days for those records[] . . . And once we have Dr. King's records . . . I'll be ready to issue a decision[.]"  Id.

The Commissioner contends that "[p]laintiff's representative obtained multiple treatment notes from Dr. King and submitted them to the ALJ."  Dkt. No. 17 at 9 (citing T. at 965-76).  The Commissioner also contends that plaintiff "does not accurately characterize the record when she asserts that additional records regarding [carpal tunnel syndrome] 'were not requested by the ALJ' . . . .  It therefore suffices to observe that [p]laintiff did not request the ALJ's assistance in securing any additional evidence." Id. at 10.  It appears that plaintiff complains that the ALJ failed to consider and obtain records related to her radiculopathy, not carpal tunnel.  See Dkt. No. 14 at 18.  Further, the ALJ's duty to develop the record exists even absent a plaintiff's explicit request for assistance.  See Yucekus v. Comm'r of Soc. Sec., 829 F. App'x 553, 558 (2d Cir. 2020) (summary order) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel[.]") (alterations in original) (quoting Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999)); cf. Desane v. Colvin, No. 3:15-CV-50 (GTS), 2015 WL 7748877, at *5 (N.D.N.Y. Nov. 30, 2015) (finding that the ALJ met his burden where the ALJ informed the attorney to contact the ALJ if the new records could not be obtained and contacted the attorney to check on the status of the records) (citing Jordan v. Comm'r of Soc. Sec., 142 F. App'x 542 (2d Cir. 2005) (summary order)).

In concluding that plaintiff's allegations of intensity and persistence of pain were not entirely consistent, the ALJ's decision references Dr. King's treatment records submitted after the hearing, explaining that plaintiff was diagnosed with carpal tunnel

syndrome, her pain was at a ten out of ten in December 2018, and that EMG testing in February 2019 showed minimal left-side carpal tunnel syndrome.  See T. at 18, 967, 969-70, 975.  Dr. King opined that plaintiff's EMGs[7] showed "right C6 radiculopathy left C8 radiculopathy and minimal left carpal tunnel syndrome.  An MRI of the cervical spine has already been ordered. . . . [and] scheduled by Dr. Hassan on 2/22/19[.]"  Id. at 974-75.  Dr. King therefore assessed both carpal tunnel syndrome and radiculopathy and stated, "[a]t this point we will await the results of the MRI scan. . . .  It does appear that the main issue right now is [plaintiff's] cervical spine."  Id. at 976.

As to whether plaintiff's radiculopathy constitutes a severe impairment, a "mere diagnosis . . . without a finding as to the severity of symptoms and limitations does not mandate a finding of disability[.]"  Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order).  Moreover, at noted, any error at step two could be harmless because the ALJ found at least one severe impairment and proceeded with the sequential evaluation process.  See Robert D., 2020 WL 2553260, at *4.  However, the ALJ's continued assessment lacks discussion of plaintiff's radiculopathy.  See T. at 18.  The ALJ referenced Dr. King's treatment note regarding plaintiff's carpal tunnel and gave Dr. Puri's opinion less weight, in part, because her "opinion does not consider the subsequent records showing some carpal tunnel syndrome in [plaintiff's] left wrist[.]"  Id. at 20.  However, the ALJ did not discuss the remainder of Dr. King's treatment note finding "right C6 radiculopathy left C8 radiculopathy[.]"  Id. at 975.  During that visit, Dr. King opined that it was not the carpal tunnel syndrome that was most concerning;

---

[7] The ALJ states that the EMG testing was in February 2019.  See T. at 18.  Dr. King's treatment note from January 3, 2019, states, "[a]t this point we will proceed with EMG nerve conduction studies on both uppers."  Id. at 973.  On February 21, 2019, Dr. King noted that plaintiff "has had her EMGs done[.]"  Id. at 975.

rather, "[i]t does appear that the main issue right now is [plaintiff's] cervical spine."  Id. at 976.  The ALJ's failure to discuss entirely plaintiff's radiculopathy and whether, and to what extent, it factored into her RFC determination constitutes reversible error.  See McIntosh v. Berryhill, No. 17-CV-5403 (ER/DF), 2018 WL 4376417, at *23 (S.D.N.Y. July 16, 2018), report and recommendation adopted, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018) ("Courts in this Circuit have consistently held that an ALJ's failure to acknowledge relevant evidence or explain its implicit rejection is plain error."  The "[p]laintiff is correct that the ALJ's decision makes no mention of the fact that [the] [p]laintiff was diagnosed with radiculopathy . . . and, consequently, it is entirely unclear whether the ALJ considered that diagnosis in his evaluation of the evidence.").

Moreover, the February 2019 MRI results are not part of the record.  "The duty to develop obligates the Commissioner to develop a complete medical record, which is detailed enough to allow the ALJ to determine the claimant's RFC[.]"  Manago v. Kijakazi, No. 20-CV-1251 (MKB), 2021 WL 4408966, at *7 (E.D.N.Y. Sept. 26, 2021) (internal citations and quotation marks omitted) (collecting cases).  The ALJ explicitly noted that the records concerning plaintiff's carpal tunnel, neck, back, and whether "she has had an MRI done" would be material to her decision, acknowledging an obvious gap in the record.  T. at 48; Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016) ("The agency is required affirmatively to seek out additional evidence *only where there are obvious gaps* in the administrative record.") (quoting Eusepi v. Colvin, 595 F. App'x. 7, 9 (2d Cir. 2014) (summary order)).  As the record does not elucidate any effort on the part of the ALJ to develop the record as it relates to plaintiff's

neck, back, and her February 2019 MRI, remand is required.  See Carr, 2018 WL 3410012, at *4.

### 4. Visual Limitations

Plaintiff argues that the ALJ erred in rejecting a vision limitation in her RFC by mischaracterizing the record, whereas the Commissioner argues that the ALJ's assessment of plaintiff's vision is supported by substantial evidence or, in the alternative, is harmless error.  See Dkt. No. 14 at 20; Dkt. No. 17 at 13-14.

"It is well-settled that while an ALJ need not mention[] every item of testimony presented or reconcile explicitly every conflicting shred of medical testimony, . . . the ALJ may not ignore or mischaracterize evidence of a person's alleged disability." Seignious v. Colvin, No. 6:15-CV-6065 (MAT), 2016 WL 96219, at *4 (W.D.N.Y. Jan. 8, 2016) (citations and internal quotation marks omitted).  Moreover, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . ."  Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted); see Nasci v. Colvin, No. 6:15-CV-0947(GTS), 2017 WL 902135, at *8 (N.D.N.Y. Mar. 7, 2017) ("[T]he ALJ is not permitted to substitute his or her own expertise or view of the medical proof for any competent medical opinion.").

The ALJ makes a single reference to plaintiff's alleged visual impairments.  See T. at 20.  In discussing "an additional functional opinion from a doctor in January 2019," that had an illegible signature, the ALJ recounted that the author noted that plaintiff "had limitations in her vision . . . [but] [t]his opinion is inconsistent with the lack of visual findings in the record."  Id.  Plaintiff avers that the 2019 medical statement is from PA Gaskill.  See Dkt. No. 14 at 20.  The medical statement contains two circles indicating

that plaintiff had limited "close vision" and "distance vision."  T. at 575.  The record also reflects that plaintiff complained of "significant worsening of her vision, especially with nearsighted and accommodation[,]" and she twice reported tunnel vision.  Id. at 385; 377, 646.  In a letter from Richard Puente, O.D., to PA Gaskill, Dr. Puente explained that plaintiff complained "of distance and near vision blur."  Id. at 961-62.  The letter is difficult to read but appears to note that "this patient is a presbyopic hyperope OD and presbyopic compound hyperopic astigma OS, with early lens changes OU, refractive . . . OD, and no pathological changes associated with diabetes."  Id. at 962.  Dr. Puente "asked the patient to return to [him] in one year for a dilated . . . examination."  Id.  As the Commissioner correctly notes, plaintiff repeatedly denied blurred vision.  See id. at 323, 327, 343, 347, 367, 373, 565; see Dkt. No. 17 at 14.

The Court finds that the ALJ did not mischaracterize the evidence.  See Laura Anne H. v. Saul, No. 6:20-CV-397 (TWD), 2021 WL 4440345, at *3-4 (N.D.N.Y. Sept. 28, 2021) (finding that "the ALJ did not mischaracterize the evidence or selectively parse the record for evidence to support his finding[,]" where both parties cited to "several pieces of evidence in the record to support" their particular arguments, but there was substantial evidence to support the ALJ's decision).  Although the record reflects plaintiff's occasional subjective complaints about problems related to her eyesight, there are no objective findings indicating that she has a vision impairment impacting her ability to work on a regular and continuing basis.  See T. at 377, 385, 646; see Clark v. Comm'r of Soc. Sec., No. 7:13-CV-256 (FJS), 2016 WL 1057047, at *6 (N.D.N.Y. Mar. 14, 2016) (citation and internal quotation marks omitted) ("[T]o the extent that [the] [p]laintiff points to evidence in the Administrative Record that reasonably might

22

support a conclusion that [the plaintiff] is disabled, whether there is substantial evidence supporting the appellant's view is not the question on appeal.").  As such, substantial evidence supports the ALJ's conclusion that there is a "lack of visual findings in the record."  T. at 20.

### B. Respiratory Limitations

"In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations."  Shepard, 2017 WL 5508377, at *8 (citing 20 C.F.R. §§ 404.1545, 416.945).  "The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence."  Id.; see supra at 15.

Here, the ALJ assessed plaintiff's obstructive sleep apnea and asthma as severe impairments.  See T. at 12.  The ALJ found that plaintiff used an inhaler for her asthma and "consistently smoked cigarettes throughout the pendency of her claim despite recommendations to stop."  Id. at 18.  The ALJ noted that plaintiff's "respiratory examinations have also been consistently normal throughout the record."  Id. (citing id. at 258, 278, 279, 280, 322, 336, 337, 418, 424).  Additionally, she observed that, as a result of plaintiff's severe sleep apnea, she was instructed to use a CPAP machine but had stopped using it in September 2017 and was later only "somewhat compliant."  Id. at 845; 17-18, 427, 442, 796.  When compliant, plaintiff reported good symptom control. See id. at 19, 411.  Dr. Puri opined that plaintiff should "not be in an environment which will increase her respiratory complaints or her skin conditions."  Id. at 282.  The ALJ

found Dr. Puri's "opinions are generally consistent with the claimant's respiratory impairments and her psoriasis, but are also consistent with her non-compliance with treatment (smoking) and her improvement when getting Stelara injections[.]"  Id. at 20. Dr. Dickerson opined that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  See id. at 69.  The ALJ found that Dr. Dickerson's opinion was "consistent with the claimant's respiratory diagnosis[.]"  Id. at 19.

The record reflects that plaintiff denied respiratory problems and had normal chest and lung examinations.  See T. at 248, 267, 274, 306, 309, 314, 317, 320, 331, 343-44, 379, 418, 662-63, 678-79, 745, 779, 786, 815.  Dr. Puri opined that plaintiff had "a history of asthma with chronic bronchitis, with episodes of shortness of breath that increase with exertion and heat[,] [but] decrease with inhaler medication when required." Id. at 278.  PA Gaskill referred plaintiff to a pulmonary physician, id. at 421, who diagnosed plaintiff with COPD.  See id. at 424-25, 435, 796, 868.  Plaintiff's symptoms were "baseline" and "clinically stable[,]" and she was prescribed numerous medications. Id. at 413-14, 424-25, 429, 435, 794-95.  The record contains multiple pulmonary tests throughout 2017 and 2018.  See id. at 415, 420, 426, 432, 437.  A spirometry test from January 2018 showed "Moderate Obstructive Airways Disease."  Id. at 426.  Plaintiff's spirometry test in April 2018 revealed "Moderately severe Obstructive Airways Disease-Reversible Features-worse than 1/2/18."  Id. at 420.

The Commissioner correctly notes that the ALJ considered plaintiff's asthma, sleep apnea, and associated pain and fatigue in her RFC determination and accommodated for them by limiting plaintiff's exposure to extreme heat, cold, humidity, and atmospheric conditions.  See Dkt. No. 17 at 11-12; see also T. at 16, 19.  However,

in performing her severity, Listings, and RFC analyses, the ALJ did not account for plaintiff's COPD; therefore, the Court "cannot determine why the ALJ may or may not have 'rejected' the evidence of COPD . . . , because she failed to mention it at all." Shepard, 2017 WL 5508377, at *9, 11 (remanding where the ALJ "failed to mention" any respiratory issue or condition at step 2 but the plaintiff was "either diagnosed with COPD or asthma," had "normal" lung examinations, "x-rays show[ed] decreased lung volume" and the record contained a pulmonary function test).  "[N]either plaintiff's counsel nor defense counsel could interpret [plaintiff's tests] accurately, nor could either counsel or the [C]ourt determine what effect such test results could have on plaintiff's functional abilities, including the ability to perform a full range of [] work." Id. at *10.  The ALJ erred in her RFC analysis because she does not address—either explicitly or implicitly—plaintiff's COPD diagnosis, pulmonary testing, prescribed medication, or treatment progress.  Compare Tracy W. v. Comm'r of Soc. Sec., No. 8:18-CV-1311 (TJM), 2020 WL 858616, at *6 (N.D.N.Y. Feb. 21, 2020) (finding that "a reasonable mind [could] find 'adequate [] support' [for] the ALJ's determination[]" where the ALJ noted the plaintiff had "a history of chronic obstructive pulmonary disease" but had normal pulmonary function tests) (citation omitted), with Riechl v. Barnhart, No. 02-CV-6169 (CJS), 2003 WL 21730126, at *13 (W.D.N.Y. June 3, 2003) (remanding where "the ALJ did not discuss the pulmonary function tests results in the record . . . or indicate whether or not those results met or equaled an impairment listed in Appendix 1, Subpart P, of the regulations.").  The Court next must assess whether this error was harmless.

The Commissioner argues that "[e]ven if the ALJ erred" as it relates to considering plaintiff's COPD, the error is harmless because plaintiff failed to identify any specific "respiratory limitations beyond what the ALJ included in the RFC finding[,]" and the jobs the vocational expert ("VE") identified at plaintiff's hearing would not expose her to respiratory irritants.  Dkt. No. 17 at 12.  This Court agrees.

"Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration."  Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (alterations omitted) (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  "[A]ny error to include environmental limitations in the RFC determination [can] be harmless error because the positions identified by the vocational expert do not require exposure to atmospheric conditions such as dusts, fumes, and gases."  Kenyon v. Comm'r of Soc. Sec., No. 5:16-CV-0260 (WBC), 2017 WL 2345692, at *5 (N.D.N.Y. May 30, 2017).  Here, the jobs the VE identified do not require exposure to weather, extreme cold, extreme heat, wet and/or humid conditions, or atmospheric conditions.  See Dkt. No. 17 at 12, n.12 (citing Dictionary of Occupational Titles §§ 211.462-010, 1991 WL 671840 (parking lot cashier); 209.687-026, 1991 WL 671813 (mail clerk); 323.687-014, 1991 WL 672783 (housekeeper/cleaner)).

The ALJ did not discuss plaintiff's COPD, whether any medical opinions assessed her ability to tolerate respiratory irritants as a result, or the extent to which the respiratory limitation in her RFC was based on her COPD.  See Long v. Colvin, No. 3:12-CV-578 (GLS/ESH), 2013 WL 3051601, at *7 (N.D.N.Y. June 17, 2013) ("[I]t is too much of a stretch to say that [the] ALJ [] took into consideration the specific nature and

extent of [the] plaintiff's asthma[] . . . [where the] analysis is totally silent with respect to [] asthma.").  Neither Dr. Puri or Dr. Dickerson considered plaintiff's COPD or the spirometry tests when determining that plaintiff should "not be in an environment which will increase her respiratory irritants" or that she should avoid concentrated exposure to dust and fumes.  T. at 282; 65, 69.  Although spirometry tests indicate that plaintiff had moderate obstructive airway disease, nothing in the record sets forth any respiratory limitations specific to plaintiff's COPD that require greater environmental limitations than those included in the RFC.  See id. at 411, 416, 420, 426, 431; see Long, 2013 WL 3051601, at *7 (The plaintiff's "subjective view of the impact of asthma on her ability to work is no more competent than opinions of treating physicians, administrative law judges or reviewing court judges on the subject of an available occupational base.").

Plaintiff contends that her COPD causes "excessive daytime sleepiness, witnessed apnea during sleep, snoring, sleepiness when sedentary, unrefreshing sleep, impaired concentration, memory problems, and weight gain."  Dkt. No. 14 at 19.  The records plaintiff cites to support this contention indicate that the symptoms were a result of "a sleep disorder[] . . . [and] [a]ssociated symptoms include morning headaches, shortness of breath (has COPD, asthma and sarcoidosis) and depression."  T. at 411, 416, 421, 427, 433.  As plaintiff points to medical no record demonstrating that her COPD requires more significant respiratory irritant limitations, or that her COPD causes any non-respiratory symptoms, the ALJ's determination that plaintiff could tolerate occasional exposure to atmospheric conditions is not based on a "best guess" but on the record before her.  Rial v. Comm'r of Soc. Sec., No. 17-CV-1128L (DGL), 2019 WL 3296617, at *2 (W.D.N.Y. July 23, 2019) (determining that an ALJ erred where "the extent of [the

respiratory] limitation was not derived from any medical opinion, or from any of the objective medical evidence of record, and appears to have been a speculative 'best guess' by the ALJ, based on his interpretation of the raw medical evidence.").

The VE was asked whether jobs would be available to a hypothetical claimant who could tolerate "occasional exposure" to, among other things, atmospheric conditions.  T. at 55; see, e.g., Sally W. o/b/o of Catherine S. v. Saul, No. 5:19-CV-0993 (GTS/ML), 2020 WL 6465446, at *5, n.1 (N.D.N.Y. Sept. 25, 2020), report and recommendation adopted sub nom., 2020 WL 6445919 (N.D.N.Y. Nov. 3, 2020) ("[T]o the extent that there was any error in the RFC with respect to the level of pulmonary irritants that Claimant could be exposed to, that error was harmless based on the vocational expert's testimony that Claimant could perform past work . . . if she was required to 'avoid dust, fumes, and respiratory irritants.'").  "The Commissioner recognizes only 'occupational reference materials or services of a [Vocational Specialist]' as authoritative evidence on this abstruse subject."  Long, 2013 WL 3051601, at *7.  Although the VE was not asked if jobs were available to a hypothetical plaintiff who could never be exposed to respiratory irritants, the jobs the VE testified to do not require any exposure to atmospheric conditions; as such, the ALJ's silence on plaintiff's COPD is harmless error and remand is not warranted on this ground.  See, e.g., T. at 575 (indicating that plaintiff could never be exposed to respiratory irritants in the 2019 medical statement); but see Cichocki v. Astrue, 729 F.3d 172, 178, n.3 (2d Cir. 2013) (per curiam) (citing Mongeur, 722 F.2d at 1037) (explaining that an ALJ need not explicitly mention all medical conditions and evidence for her determination to be based

on substantial evidence so long as her rationale can be otherwise gleaned from her decision.)

### C. Weight of Opinions

Plaintiff argues that the ALJ erred insofar as she "discounted PA Gaskill's opinion, and instead, . . . adopted Dr. Dickerson's findings almost verbatim." Dkt. No. 14 at 24.  Specifically, plaintiff contends that, because "[t]he record since Dr. Dickerson's review is much more robust than existing on June 6, 2017, and virtually all of the treatment notes of [plaintiff's] multiple specialists were not reviewed by Dr. Dickerson[]," the ALJ's reliance on Dr. Dickerson's opinions was in error.  Id. at 23. Moreover, plaintiff contends that because the ALJ could not discern the author of the 2019 medical source statement, see T. at 20 (citing id. at 575-76), "the ALJ did not consider the [author's] treatment relationship, the supportability of the opinion, or the consistency of the opinion with the record as a whole."  Id. at 22.  The Commissioner argues that the ALJ properly credited PA Gaskill's and Dr. Dickerson's medical opinions because PA Gaskill was not an acceptable medical source, the 2019 medical statement was a preprinted form and not a narrative opinion, and the ALJ reached a more restrictive RFC than Dr. Dickerson suggested.  See Dkt. No. 17 at 17-21.

For claims, like plaintiff's, that were filed before March 27, 2017, ALJs are required to follow the treating physician rule set forth in 20 C.F.R. §§ 404.1527 and 416.927 (2012)—"which generally requires a measure of deference to the medical opinion of a claimant's treating [source]."  Halloran, 362 F.3d at 31.  Unless a treating source's opinion is given controlling weight, the ALJ must explain the weight given to the opinions of a State agency consultant, as the ALJ must do for any opinions from

treating sources, nontreating sources, and other nonexamining sources.  See 20 C.F.R. § 404.1527(e)(2)(ii) (2012).  "The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."  Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) (citing 20 C.F.R. § 416.927(e)(2)(i) (2012)); see Calvin E. v. Saul, No. 5:18-CV-060 (CFH), 2019 WL 2869681, at *6 (N.D.N.Y. July 3, 2019) (collecting cases).  "[T]he mere addition of medical records after a State agency medical examiner's review [will] not [automatically] render the examiner's opinion invalid."  Carthron-Kelly v. Comm'r of Soc. Sec., No. 5:15-CV-0242 (GTS/WBC), 2017 WL 9538379, at *6 (N.D.N.Y. Sept. 25, 2017).  "While medical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding . . . this is not true where such opinions are supported by substantially similar findings in treatment notes and other opinions in the record[.]"  Id. at *4 (citations and internal quotation marks omitted).

As to the opinion of a physician's assistant, "[w]hile an ALJ may consider evidence from a PA, such a source is not an 'acceptable medical source' and therefore cannot constitute a 'treating source.'"  Evans v. Colvin, 649 F. App'x 35, 38 (2d Cir. 2016) (summary order) (quoting 20 C.F.R. §§ 404.1502, 404.1513(d)(1)).  "The Second Circuit has made clear that an ALJ is not required to defer to such a source 'under the treating source rule, but merely to consider [a PA's] opinion as with any other probative evidence.'"  Adam T. v. Comm'r of Soc. Sec., No. 6:20-CV-00492 (TJM), 2021 WL 4519809, at *6 (N.D.N.Y. Oct. 4, 2021) (alteration in original) (quoting Evans, 649 F. App'x at 38-39).  "Nonetheless, an ALJ must weigh that opinion according to a number

of factors, including the length, nature, and extent of the treatment relationship and the frequency of examination; evidence in support of the opinion; the opinion's consistency with the record as a whole; and other relevant factors."  Evans, 649 F. App'x at 39 (citing 20 C.F.R. § 404.1527(c)); see 20 C.F.R. § 404.1527(f)(1).  Generally, the ALJ should explain the weight given to a PA's opinion "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning, when such opinions may have an effect on the outcome of the case."  Lydia L. v. Saul, No. 3:19-CV-1084 (DJS), 2020 WL 7629450, at *5 (N.D.N.Y. Dec. 22, 2020) (quoting SSR 06-03p, 2006 WL 2329939, at *6); Adam T., 2021 WL 4519809, at *6 (remanding where the PA's treatment record included reference to other treatment providers and prescribed medications that may have "influenced her opinion in her medical source statement" which "appear[ed] to assess that [the] [p]laintiff was limited beyond" the hypotheticals presented to the VE, and according greater wight to the PA's opinion may have changed the ALJ's opinion).

In Russell v. Comm'r of Soc. Sec., the ALJ afforded "significant weight" to the state agency physician's opinion.  No. 5:13-CV-1398 (TJM), 2015 WL 5602939, at *3 (N.D.N.Y. Sept. 22, 2015).  The state agency physician rendered his opinion in November 2010, but the plaintiff continued to be treated by his treating physician until October 2011.  See id.  The Court held that the ALJ's decision to afford the state agency physician's opinion great weight was not supported by substantial evidence because he "did not have the benefit of a large portion of the medical record, and a portion which appeared to show that" the plaintiff's limitation had worsened.  Id. at *4; but see Wilson v. Saul, No. 3:18-CV-01097 (WWE), 2019 WL 2603221, at *11 (D.

Conn. June 25, 2019) (holding that the ALJ's RFC was based on substantial evidence because "the ALJ did not solely rely on the State agency doctors['] physical RFC but on the entirety of the record[,]" and "there is no indication that the later received medical evidence would have had any effect on the" consultative examiners' opinions).  By contrast, this Court upheld an ALJ's RFC determination and decision to afford a state agency consultant's opinion "significant weight" because the plaintiff "failed to show that the [later-added] additional records contained information that was contrary to [the consultative examiner's] findings or the ALJ's ultimate RFC determination."  Carthron-Kelly, 2017 WL 9538379, at *4, 6; see also Lydia, 2020 WL 7629450, at *4 (remanding where the PA's "lengthy treatment experience may provide special insight into [the] [p]laintiff's physical functional limitations"; and her treatment, and the resulting functional limitations, formed the basis of the ALJ's RFC determination.).

### 1. PA Gaskill

The ALJ explained that plaintiff's treatment with PA Gaskill began in March 2017 and plaintiff's initial physical examination was normal.  See T. at 17 (citing id. at 273-275).  The ALJ noted that plaintiff "reported few-to-no flares of her psoriasis[,] . . . and in May 2017 [] she exhibited a normal spine, full strength in her extremities, and full range of motion and no tenderness in her joints."  Id. (citing id. at 629-32).[8]  The ALJ also referenced the 2019 medical statement that plaintiff contends PA Gaskill authored.  See id. at 20; Dkt. No. 14 at 20-21.  The ALJ noted that the 2019 medical statement "is difficult to read and the signature is illegible.  As such, it is difficult to ascertain who this

---

[8] The ALJ cites to Exhibit 2F at page 25 in the administrative transcript—a citation which the Court cannot identify.

treatment source is and upon what they base their opinions." T. at 20. Regardless, the

ALJ reviewed the 2019 medical statement's findings which explained that plaintiff

> could not work any hours and could lift nothing, could stand for 60 minutes and sit for two hours total in a workday, and had significant limitations balancing, stooping, bending, tolerating environmental changes. This doctor also noted the claimant could frequently use her right and, raise her arms above her shoulder, and operate a motor vehicle, would need to frequently elevate her legs, and had limitations in her vision ([see T. at 775-76]). This opinion is inconsistent with the lack of visual findings in the record. Although the claimant testified she has to elevate her legs frequently, the treatment record does not contain such a report and thus this portion is also inconsistent with the treatment record. For these reasons, these opinions are given little weight.

Id. The ALJ gave the 2019 medical statement "little weight" because "[t]his

opinion is inconsistent with the lack of visual findings in the record. Although the

claimant testified she has to elevate her legs frequently, the treatment record

does not contain such a report and thus this portion is also inconsistent with the

treatment record." Id.

The record reflects an extensive treatment history with PA Gaskill

throughout 2017 and 2018. See T. at 273-75, 617-19, 629-32, 646-50, 652-55,

672-75, 696-98, 722-24, 743-47, 768-76, 788-91, 802-06, 834-37, 863-69, 890-

93. These records reflect numerous diagnoses: diabetes, hypertension,

depression, mixed hyperlipidemia, hypothyroidism, anxiety, COPD, and obesity.

See id. PA Gaskill also referred plaintiff to other physicians, and referenced

these visits in her treatment notes. See, e.g., id. at 788 ("[Plaintiff] sees Dr.

Hassan for seizures and he increased her gabapentin but that has not been

helpful."); id. at 396-410 (referring plaintiff to Dr. Nancy Dean-Grosack for

diabetes); id. at 746 (noting that plaintiff has an appointment with Dr. Ojugbell for

excision and biopsy"); id. at 655 (noting that plaintiff "has a neuro consult on

8/24/17"); see Adam T., 2021 WL 4519809, at *7 ("[The] PA [] references that

[the] [p]laintiff was treating with or seeking treatment from other providers . . .

The ALJ should have analyzed whether this information known to [the] PA []

influenced her opinion in her medical source statement.").  Moreover, in

presenting hypotheticals to the VE, plaintiff's representative inquired whether

there would exist any jobs in the national economy for an individual who "could

only sit two hours in an entire work day, [and] can stand for one hour during an

entire work day"—consistent with the 2019 medical statement.  Id. at 57.  The VE

testified that there would be no work available.  See id.

The ALJ gave "little weight" to the 2019 medical statement but analyzed only

whether the opinion was consistent with the record as it relates to plaintiff's vision and

need to elevate her leg.  T. at 20.  The Commissioner argues that it is appropriate to

discount the 2019 medical statement because pre-printed check-box or fill-in-the-blank

forms have limited use or probative value; and, in the alternative, the ALJ did not

discount the opinion because of the illegible signature, but "because it was inconsistent

with the record."  Dkt. No. 17 at 18; 17.

First, the signature on the medical statement is illegible; therefore, the Court

cannot determine that it belongs to PA Gaskill.  See T. at  576.  Second, "[f]orm reports

of this sort are, by their nature, of limited evidentiary value."  Scitney v. Colvin, 41 F.

Supp. 3d 289, 301 (W.D.N.Y. 2014) (finding it appropriate for the ALJ to give little weight

to a check-box form and noting the inconsistencies between that form and the

physician's treatment notes).  However, the ALJ did not discount the opinion for this

reason.  See T. at 20.  The ALJ discounted the opinion because the findings related to plaintiff's vision and need to elevate her legs were unsupported.  See id.  The ALJ made no findings as to the remainder of the opinion, nor indicated whether it was given any weight based on its consistency with the record.  See id.; see Drollette v. Colvin, No. 8:13-CV-0280 (GTS/CFH), 2014 WL 2880022, at *6 (N.D.N.Y. June 23, 2014) ("While the ALJ is empowered with the discretion to afford less than controlling weight, or even no weight, to the opinion of 'other sources', the ALJ has a duty to address and discuss the opinion.").  For example, the 2019 medical statement noted that plaintiff could "never . . . [t]olerate dust, smoke, or fumes exposure[,]" which is consistent with Dr. Dickerson's finding that plaintiff should avoid concentrated exposure to dust and fumes. Id. at 575; 69; see supra at 27 (quoting Zabala, F.3d at 409); see also 20 C.F.R. § 404.1527(c)(4) (2012) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Moreover, the VE's testimony demonstrated that, had the medical statement's opined limitations been included, plaintiff could not work.  See, e.g., Adam T., 2021 WL 4519809, at *6.

The ALJ also made only passing reference to PA Gaskill's treating relationship with plaintiff but did not discuss her lengthy treatment record.  See T. at 17.  As explained, these treatment records reveal multiple diagnoses, referrals to other physicians, and plaintiff's medication history and its effect.  See id. at 273-75, 617-19, 629-32, 646-50, 652-55, 672-75, 696-98, 722-24, 743-47, 768-76, 788-91, 802-806, 834-37, 863-69, 890-93.  "The Regulations require the ALJ to engage in a detailed analysis of [a PA's] treatment and provide 'good reasons' for discounting her opinions." Drollette, 2014 WL 2880022, at *6; cf. Grisel A. v. Kijakazi, No. 3:20-CV-00719 (TOF),

35

2021 WL 4350565, at *4 (D. Conn. Sept. 24, 2021) (affirming the ALJ's decision where "the ALJ extensively set forth his reasons for concluding that [the] PA['s] [] opinions were inconsistent with the other 'medical evidence on record.'").  As such, remand is warranted for the ALJ to attempt to determine the author of the 2019 medical statement, and what, if any, weight is assigned to the remainder of it; and to address PA Gaskill's full treatment history more thoroughly.

### 2. Dr. Dickerson

The ALJ "place[d] great weight in the opinions of Determination Services consultant R. Dickerson, M.D., . . ."  T. at 19.  Dr. Dickerson authored his disability determination on June 6, 2017.  See id. at 72.  Dr. Dickerson reviewed Dr. Puri's physical consultative examination report, Dr. Shapiro's psychological consultative report, and plaintiff's 2017 medical records.  See id. at 63-64, 67-68.  Dr. Dickerson opined that plaintiff "could sit, stand, or walk for six hours, could work at a light exertional level, and needed to avoid concentrated exposure to pulmonary irritants."  Id. (citing id. at 61-72).  The ALJ found this assessment to be consistent with plaintiff's "respiratory diagnosis"; her "reports that she could drive, go shopping, care for her personal needs, and go out by herself"[;] and her "improvement with Stelara injections and the full range of motion and negative straight leg testing noted through the record[.]" Id. (citing id. at 278-84, 257-58, 324, 328).  The ALJ expressed that,

> [a]s a Disability Determination Services consultant, Dr. Dickerson is familiar with Social Security policies, guidelines, and regulations. Although additional limitations were added to the residual functional capacity based on evidence submitted after Dr. Dickerson's review, their opinion is generally consistent with the record as a whole and given great weight.

Id.  Confusingly, the ALJ gave consultative examiner Dr. Puri's opinion "partial weight" because Dr. Puri "only saw [plaintiff] once and had no treating relationship[,]" and his "opinion does not consider the subsequent records showing some carpal tunnel syndrome in [plaintiff's] left wrist"—circumstances that also apply to Dr. Dickerson.  Id. at 20.

The record before the ALJ contained an abundance of medical records from 2018 and Dr. King's 2019 records which Dr. Dickerson did not review.  See T. 756-976. Dr. Dickerson "did not have the benefit of a large portion of the medical record," which among other things, diagnosed plaintiff with carpal tunnel syndrome and showed radiculopathy of the spine.  Russell, 2015 WL 5602939, at *3; see T. at 967, 969-70, 975.  These records show that as a result of plaintiff's carpal tunnel, she was having "numbness and tingling in both hands" and she "drop[s] items."  T. at 966.  Dr. King recommended plaintiff wear "bilateral cockup wrist splints . . . while sleeping and if helpful during the day as tolerated."  Id. at 967.  Dr. King also prescribed plaintiff medications to manage her carpal tunnel and later noted that the splints appeared to be helping and recommended their continued use.  See id. at 967, 970.  The ALJ expressly noted that "additional limitations [were added] to the residual functional capacity based on evidence submitted after Dr. Dickerson's review[,]" and that plaintiff's "reaching limitations further consider problems due to her carpal tunnel."  Id. at 19.  However, the ALJ determined that plaintiff "could frequently reach, handle, finger, and feel with both upper extremities."  Id. at 16.  Dr. Dickerson opined that plaintiff could have unlimited exposure to extreme cold, extreme heat, wetness, and humidity, but would need to avoid concentrated exposure of fumes, odors, dusts, gases, and poor ventilation.  See

37

id. at 69.  The ALJ stated that Dr. Dickerson's findings were "consistent with [plaintiff's] respiratory diagnosis"; however, it is unclear to which respiratory diagnosis the ALJ is referring because the record she cited references plaintiff's COPD and obtrusive sleep apnea and noted that plaintiff should "continue with Cpap therapy."  Id. at 19; 414. Moreover, Dr. Dickerson did not consider plaintiff's carpal tunnel diagnosis or radiculopathy of the spine, as reflected in Dr. King's records; PA Gaskill's extensive treatment history; or the 2019 medical statement with the unknown author, recommending greater restrictions.  See id. at 61-72; Maxwell H. v. Comm'r of Soc. Sec., No. 1:19-CV-0148 (LEK/CFH), 2020 WL 1187610, at *5 (N.D.N.Y. Mar. 12, 2020) (finding that the consultative examiner's "opinion—upon which the ALJ relied in making his RFC determination—includes no discussion of or reference to this diagnosis because [the] [p]laintiff had not yet received any such diagnosis[]"; thus, the "opinion was stale and it was error for the ALJ to rely on it.").  As Dr. Dickerson did not have the benefit of the aforementioned records, primarily those diagnosing plaintiff with carpal tunnel syndrome and requiring her to use wrists splits, the ALJ erred in affording his opinion "great weight."  T. at 19; see Maxwell H., 2020 WL 1187610, at *5.  Accordingly, remand is required on this ground.

### VII. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that plaintiff's Motion for Judgment on the Pleadings, Dkt. No. 14, is **GRANTED**; and it is further

**ORDERED**, that defendant's Cross-Motion for Judgment on the Pleadings, Dkt. No. 17, is **DENIED**, and the matter is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further consideration of plaintiff's radiculopathy diagnosis; and the weight afforded to (1) PA Gaskill's full treatment history, (2) the 2019 medical statement from the unknown author, and (3) Dr. Dickerson's opinion.

**IT IS SO ORDERED.**

Dated: January 11, 2022
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge